UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
<u>EVANSVILLE DIVISION</u>

| | |
|---|---|
| TERRI BASDEN, ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Cause No.  3:10-CV-00002-WTL-WGH |
| PROFESSIONAL TRANSPORTATION, ) | |
| INC., ) | |
| Defendant. ) | |

**<u>PLAINTIFF'S RESPONSE TO MOTION SUMMARY JUDGMENT</u>**

Comes now Plaintiff, Terri Basden by counsel Rudolph, Fine, Porter & Johnson, LLP and files her Response to Professional Transportation, Inc.'s ("PTI") Motion for Summary Judgment as follows:

**<u>I. INTRODUCTION</u>**

Terri Basden ("Basden") suffers from Multiple Sclerosis ("MS") a chronic inflammatory disorder of the central nervous system and one of the most common causes of non-traumatic disability among middle-aged people in the United States. In her own words, she is suing PTI:

> Because I feel like the way they did me wasn't right.  I mean, they may have a policy about absenteeism and things like that, but I feel like, you know, that they—I mean, it wasn't like I was just calling off work to be calling off.  I was calling off because I had a legitimate medical problem; and every time I missed, I made sure that I had an excuse from the doctor.  I took time out to go to the doctor to make sure that I got written notice from the doctor, turned it in every time, tried my best to keep working even though I was having all these problems.  And they just looked at it like any other absence.  And, you know, they terminated me after—even though I tried and tried to do the best I could to hold on to my job.  Then they fought my unemployment, caused me to go through a lot of stuff, losing my apartment, losing my car.  You know, and I just—basically, it's not for the money.  It's the principal of the thing, because, you know, there's certain times when people can't help it when they miss work.  You know, say if you got cancer.  They'd still expect you to show up for work every day with cancer if you're sicker than a dog, you know?  I mean, there should be some type of policy in place for people who have a legitimate illness where they don't have to worry about losing their job because they're too sick to come to work, and that's why I am suing.
>
> … I mean, when I got terminated, they terminated my health insurance, so then I ended up with a bunch of medical bills.  It caused me to get evicted from my apartment because all of the

1

sudden I didn't have a job anymore. Then when I tried to file for unemployment so I could get by, they fought that. It took me six months to get the unemployment. And, you know, it caused me to lose my car. You know, it cost me a lot of stuff, and I'm not trying to get rich off of them. Believe me, I'm not. But, you know, wrong is wrong, and they did me wrong, as far as I'm concerned. (Exhibit A- Basden Dep. pp. 138-40).

## II.  MATERIAL FACTS IN DISPUTE

Basden began working at PTI as a closer/dispatcher in June of 2007. (Complaint ¶10). PTI's dispatchers are given a copy of the Addendum to the United Companies Handbook ("Addendum"). (Exhibit B- Acuff Dep. pp. 15, 17-18, Exhibit C). They are not however given a copy of the United Companies Handbook ("Handbook"), and no copy is located in the dispatch area. (Acuff Dep. p. 18). The signature page signed by Basden acknowledges only that she received the Addendum, not the Handbook. (Acuff Dep. p. 18). There is no description of PTI's Family and Medical Leave policy in the Addendum. (Acuff Dep. pp. 18-19). There is no description of PTI's policies under the Americans with Disabilities Act ("ADA") in the Addendum. (Acuff Dep. p. 19).

PTI's Absenteeism policy is contained in the Addendum. Teresa Kirk ("Kirk"), the assistant manager of the dispatch department, is designated as the attendance keeper in that department. An attendance incident consists of missing more than 4 hours of a shift up to five consecutive shifts. (Exhibit D- Kirk Dep. p. 16).[1] After the 5th incident, a verbal warning is given. (Kirk Dep. p. 16). After the 6th incident, a written warning is given. (Kirk Dep. p. 16). After the 7th incident a suspension is given, and the 8th incident calls for termination. (Kirk Dep. p. 16). If someone cannot come to work because she is sick, she contacts a shift supervisor who puts it in the shift notes so that it can be recorded on the dispatcher's attendance record. (Acuff Dep. p. 24). Dispatchers do not have to call in every day of an incident. (Kirk Dep. pp. 18-19). When a dispatcher brings in a doctor's note, it is placed in Kirk's file and she takes it to payroll department employee Jeremy Morris. (Kirk Dep. p. 21). Kirk does not

---

[1]  After two consecutive days off the dispatcher must bring in a doctor's note. (Kirk Dep. p. 16).

review the doctor's notes. (Kirk Dep. p. 21). Payroll maintains the dispatcher's personnel filed. (Kirk Dep. p. 23).

In January 2008 Basden fell at home after a dizzy spell, and went to the emergency room where a CT scan was performed. (Basden Dep. p. 30; Exhibit E- Basden Dep. II. pp. 15-16). The attending physician was concerned by the result of the CT scan, which indicated she might have MS so an MRI was scheduled and Basden was referred to a neurologist. (Basden Dep. II. p. 16). Basden had another dizzy spell that sent her to the emergency room in February of 2008 (Basden Dep. II p. 28). After seeing a neurologist, Basden underwent a spinal tap in March of 2008. (Basden Dep. II p. 27). It was at that point that Basden's neurologist was "pretty confident" she had MS but still wanted her to see a specialist. (Basden Dep. p. 34). Basden's symptoms included heat intolerance, fatigue, numbness, and interference with vision. (Basden Dep. p. 50). Basden's appointment with the MS specialist was set for June 23, 2008. (Basden Dep. p. 142). The diagnosis of MS was confirmed by the specialist. (Basden Dep. p. 142). The specialist put Basden on medication that has made a big difference in her condition. (Basden Dep. p. 52).

Beginning in January of 2008, for every incident of absenteeism, Basden provided PTI with notes from her doctors. (Basden Dep. p. 134). John Davis ("Davis") and John Grider were Basden's shift supervisors and would have received Basden's notes from her doctor. (Basden Dep. pp. 105-07). They were aware that Basden was being tested for MS. (Basden Dep. pp. 105-07). One fax from Basden's doctor was addressed directly to Kirk. (Basden Dep. p. 108). Basden told both Kirk, George Acuff (PTI's Dispatch Manager since 2000 hereinafter "Acuff"), Davis and others that her doctor believed she had MS but that he wanted her to see a specialist to confirm the diagnosis. (Basden Dep. pp. 114-15; Acuff Dep. p. 8). In addition to conversations with her supervisors, the written medical information Basden provided to PTI included the following:

· Basden was seen at the Deaconess ER on January 16, 2008 and could return to work on January 21, 2008.  "Call for MRI of brain follow up with a neurologist… return for increase dizzy or ↑ falls"

· Basden was seen at the Deaconess ER on February 1, 2008 and could return to work on February 6, 2008 "make an appointment to see neurologist"

·  Basden turned in her "Lumbar puncture/Myelogram Discharge Instructions" for March 25, 2008 with a note that said she "had a procedure at Gateway Hospital and should not return to work til Thursday 3/27/08."

· "Due to dizziness & work-up for MS, excuse Ms Basden from work: 4/7/08, 4/8/08, 4/11/08 to present.  Please excuse her until she is again seen by a neurologist.  She has a tentative appointment w/ Dr. Frances on 4/29/08 but this may change."

· Basden "can go back to work for a few hrs a week full time work is going to depend on Dr. Matson's (IU) recommendations." on April 30, 2008 and "Pt Terri Basden may work 20 hrs per wk- starting 05/01/02 & no more than 5 hours per day." (Exhibit F, Exhibit G- Greulich Dep. p. 25).

Basden had trouble performing what is called "closing" work at PTI because of numbness in her fingers.  (Basden Dep. p. 48). Basden asked to be changed from a "closer" to a dispatcher because closing required more typing and was difficult with numbness in her hands.  (Basden Dep. II pp. 47-48). Basden was changed from a "closer" to a dispatcher, but after the relative of a shift supervisor began working at PTI Basden was returned to primarily "closing" duties that were physically more difficult for her than dispatching duties.  (Basden Dep. II pp. 47-48).  In March of 2008 Basden learned that there was a part time position open and requested it.  (Basden Dep. II p. 33).  Instead of going to Basden the part time position was given to new hire. (Basden Dep. pp. 33-34).  It was only in May of 2008 that Basden was moved to part time when her neurologist sent a note insisting that was her work restriction.  (Basden Dep. II. pp. 34-36).[2]

Kirk knew that Basden was dizzy, was going back and forth to the doctor and that she was testing for "multiple things." (Kirk Dep. p. 36). The shift supervisors give verbal and written warnings to the

---

[2]  Acuff does not recall whether Basden requested to be moved to part time twice with only the second request being granted. (Acuff Dep. p. 34).

4

dispatchers at the direction of Kirk or Acuff.  (Kirk Dep. p. 44).  Basden received a verbal warning for her 5th absenteeism incident and a written warning for her 6th incident.  Basden called in sick to work on May 22, 2008 due to her MS symptoms, and Kirk prepared a suspension notice for Basden.  (Acuff Dep. p. 50; Kirk pp. 47-48).  The notice was not signed or dated.  (Kirk Dep. pp. 47-48; Exhibit H).  Basden was notified of her suspension over the phone by Acuff on May 22, 2008 (Kirk Dep. p. 49).  Basden was suspended for three days, including May 23, 24, and 25.  (Kirk Dep. p. 56).  Kirk does not know whether or not due to her illness Basden could have worked those three days anyway.  (Kirk Dep. p. 56).

By late May 2008 Basden knew that she had many absenteeism incidents, knew that she had an appointment scheduled with a specialist who could provide her with treatment (Basden now uses a drug called Rebiff three times a week), and wanted to keep her job so she contacted PTI's human resources department. (Basden Dep. p. 53; Basden Dep. II p. 53). Steve Greulich ("Greulich") is the Director of Human Resources at PTI and at the relevant time he was the Human Resources Manager. (Greulich Dep. pp. 4-5). Basden called him, explained that she was having attendance issues that were caused by MS and that she had an upcoming doctor appointment. (Greulich Dep. p. 20). Basden said that she would like to keep her job if possible.  (Greulich Dep. p. 20). Greulich told Basden that she did not qualify for any leave, but that if she left on good terms he might re-hire her. (Greulich Dep. p. 20).  Having received no help from Greulich Basden approached David Wilson, a payroll employee, who suggested Basden file for a personal leave of absence of 30 days and provided her with a request for leave form. (Basden Dep. p. 89).[3]  He acknowledged that that would give Basden time to get to her appointment with the MS specialist without violating the attendance policy. (Basden Dep. p. 90). Basden knew that she would not be paid during that time. (Basden Dep. II p. 42).  On May 23, 2008, the first day of her suspension,

---

[3] PTI refers to a written policy concerning personal leaves of absence.  It is in the United Companies Handbook, of which Basden did not receive a copy. (Basden Dep. p. 78-79).

5

Basden went to PTI and filled out and submitted the form requesting personal leave. (Acuff Dep. p. 50).

Acuff had "got word" at some point that Basden was having medical tests. (Acuff Dep. pp. 35-36). Acuff received the application for leave form from Basden in his box on Monday May 26, 2008 and returned it to Basden by mail on May 27, 2008. (Acuff Dep. p. 43). When Acuff denied the leave request and mailed the form to Basden. (Acuff Dep. p. 42). Acuff knew that she was requesting leave because of "Complications due to medical illness (MS)" (Acuff Dep. p. 42). Regardless, Acuff did not discuss the request with anyone in human resources even though it concerned a medical issue. (Acuff Dep. p. 42).

Having filed her request for personal leave, Basden did not call in to work on May 26, 2008. (Kirk Dep. p. 57). Assuming Basden was not able to work due to her MS during the days of her suspension May 26th constituted the 5th day of Basden's 7th absenteeism incident not the first day of her 8th incident. (Kirk Dep. pp. 56-58). Kirk documented May 23, 24, and 25th to be suspension days however, not consecutive days of absenteeism, and claims that the absence on the 26th constituted an 8th incident and the reason for Baden's termination. (Kirk Dep. p. 58). Acuff testified that Basden was terminated as a "no-show" on the 26th because she did not call in to work, not because of an 8th incident of absenteeism. (Acuff Dep. p. 52). Kirk keeps a record of when an employee "no shows" without a phone call. (Kirk Dep. pp. 59-60). Kirk, however, did not make any such notation on Basden's file for May 26th. (Kirk Dep. p. 60).

After Basden received the form back she contacted Acuff and left him a voicemail. (Acuff Dep. p. 44). Acuff returned the call and told Basden that he had assumed she had quit because she had not returned to work after submitting her request for leave. (Acuff Dep. p. 44). Basden would have been eligible for FMLA leave if she continued to be employed by PTI until June 29, 2008. (Basden Dep. p. 75).

6

Human Resources does not train the dispatch managers, rather that is left to a United Companies training team. (Greulich Dep. p. 7). Acuff does not recall having any training classes about the ADA. (Acuff Dep. p. 31). Kirk believes she may have received some training in the ADA but does not recall what she learned about it. (Kirk Dep. pp. 66-67). Greulich has never instructed Acuff as to what materials should be located in a dispatcher's personnel file. (Greulich Dep. p, 18). As such, there are medical records contained in Basden's general personnel file. (Greulich Dep. p. 25, Exhibit F).

Greulich testified that PTI does not make exceptions to the leave of absence policy. (Greulich Dep. p. 23-24). Kirk claims that she always applies the attendance policy steps as if they were mandatory, even though the policy itself does not make the disciplinary steps mandatory, i.e. 5th incidents (sic) within a year *could* result in a verbal warning, a 6th incident within a year *could* result in a written warning; a 7th incident within a year *could* result in a three day suspension without pay; an 8th incident within a year *could* result in termination of employment. (Kirk Dep. p. 17; Exhibit A). PTI provided a list of dispatchers who were disciplined in 2007 and 2008 for attendance issues. (Greulich Dep. pp. 27-28). Interestingly, that information indicates that exceptions to the absenteeism policy have been made on numerous occasions, including:

- Amanda Alexander was given three verbal warnings for attendance between May and December 2007 and one written warning.

- Arielle Alvey was given no verbal warning but received two written warnings in September and October of 2008.

- Kelly Anderson received three verbal warnings between July 2007 and February 2008 and then three written warnings between September 2008 and November 2008, and continues to work at PTI.

- Donna Brown received one verbal warning in September of 2007, one written warning in March of 2008, and two suspensions in July and March of 2008 and continues to work at PTI.

- Casey Burns received one written warning in August of 2008, two written warnings in August and October of 2008 and one suspension in November of 2008 and continues to work at PTI.

- Derek Burris was given three verbal warnings in May 2007, November 2007, and January 2008, and two written warnings, one in June 2007 and one in June 2008 and continues to work at PTI.

- Christina Donofrio received a verbal warning in October of 2007, two written warnings in November 2007 and December 2007, and a suspension in February of 2008.

- Shawn Eaden received a verbal warning in October of 2007, three written warnings between January 2008 and April 2008, and two suspensions, one in May 2008 and one in July 2008.

- Tammy Ellis-Baker received no verbal warnings but had two written warnings.

- Gina Garrett received two verbal warnings in February and October 2006, two written warnings in April 2007 and November 2007, and a suspension.

- Nicole Geske received a verbal warning and written warning in 2008, and two suspensions in 2008.

- Matthew Hoy received a verbal warning in April of 2007, a written warning in April 2007, and three suspensions, one in September of 2007, one in May 2008 and one in July 2008.

- Shane Hunter received two verbal warnings, one in November 2006 and one in June 2007, a written warning in December of 2006, and two suspensions, one in March and one in September of 2007.

- David Kinney received two verbal warnings in October of 2007, two written warnings, one in June 2007 and one in November 2997, and two suspensions, one in December of 2007 and one in February of 2008.

- Alicia Lankford was given one verbal warning in October of 2007, and two written warnings, one in December 2007 and the other in January 2008 and continues to be employed at PTI.

- Rebecca Leeds received three verbal warnings in August and November 2007 and April 2008, and one written warning in October of 2008 and continues to work at PTI.

- Lindsay Martin was given a verbal and written warning in March of 2008, and then was given two suspensions in March and April 2008.

- Amber Miles was given two verbal warnings, one in November 2006 and one in May 2007, two written warnings, one in November 2005 and one in June 2007, and two suspensions, one in January 2006 and one in January 2007 and is still employed by PTI.

- Jinger Pipper received two verbal warnings, one in June 2007 and one in November 2007,

8

two written warnings, one in April 2007 and one in January 2006, and a suspension in 2006.

- Lisa Sanders received two verbal warnings in July and September 2007

- Tiffany Smallwood received two verbal warnings in March 2006 and February 2007, two written warnings in May 2006 and March 2007, and one suspension in August 2007 and continues to work at PTI.

- Christina Tennes received a verbal warning in February of 2008, two written warnings in December 2007 and March 2008 and a suspension in March 2008.

- Belinda Thorsen two verbal warnings on August 2007 and September 2007, a written warning in September 2007 and two suspensions in September 2007 and March 2008 and continues to work at PTI.

Out of 177 dispatchers disciplined for attendance issues in 2007 and 2008, 23 were not subjected to the so-called mandatory attendance policy and were given "breaks." None of these individuals were perceived to be disabled by PTI. (Exhibit I).

### III. ARGUMENT

Basden is making three claims, first, that PTI failed to accommodate her pursuant to the ADA, and second that PTI terminated her either because of her disability or as retaliation for seeking accommodation under the ADA. Third, Basden claims that PTI terminated her to interfere with the FMLA rights she would be receiving had she been employed with PTI one additional month. For the forthcoming reasons, PTI's request for summary judgment should be denied.

**A. PTI Violated the Americans with Disabilities Act ("ADA")**

<u>1. Basden was Disabled or Perceived to Be Disabled</u>

To make out a claim under the ADA, an individual must show: 1) that she is disabled; 2) that she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and 3) that the employer took an adverse job action against her because of her disability *or* failed to make a reasonable accommodation." <u>Stevens v. Ill. Dep't of Transp.</u>, 210 F.3d 732, 736 (7th

Cir.2000) (emphasis added), see <u>Bond v. Sheahan,</u> 152 F.Supp.2d 1055, 1062-63, 1071-75 (N.D.Ill.2001) (denying summary judgment on issue of whether defendant reasonably accommodated plaintiff's asthma by failing to transfer her and by failing to enforce a non-smoking policy).

By the time Basden began requesting initial accommodations for her job—to be moved to a dispatcher position (initially granted but then reversed) and her first request for part time hours, and certainly by the time Basden requested short term personal leave, Basden was suffering from a impairment that substantially limited her major life activities.  She was dizzy, she fell, she was unable to type well enough to do "closer duties" and she had to call in sick due to fatigue and dizziness that would last multiple days in a row.  She was undergoing CT scans, MRIs and a lumbar puncture all of which indicate the serious nature of her illness.  Her illness substantially interfered with her ability to perform manual tasks (typing was difficult due to numbness), her ability to stand and walk (she was dizzy and would fall), and her ability to work due to fatigue.  The fact that Basden had received a tentative diagnosis of MS in March of 2008 with the confirmation not coming until June of 2008 is irrelevant—the fact is that Basden did have MS from January 2008 forward, she had the symptoms and limitations caused by the illness, and therefore she was suffering from a serious medical condition that was impairing her ability to perform major life activities.  The nature of MS is that it is a difficult condition to diagnosis, and the final diagnosis requires multiple tests and waiting time between tests.  (Exhibit J).  It does not mean that the person does not have MS until after a specialist provides final confirmation.

Moreover, Basden was perceived by PTI as having a serious illness that affected her major life activities.  It knew that she was unable to come to work for several short periods because she was being treated in the emergency room.  PTI knew that she was undergoing major medical tests.  Basden informed her shift supervisors that her neurologist believed she had MS.  The medical information provided by PTI clearly indicated that she was being worked up for MS (*supra*).

### 2. Basden Was Qualified if Accommodated

To succeed on her failure-to-accommodate claim under the ADA, Basden must present facts with which a jury could find that she is a qualified individual with a disability. EEOC v. Sears, Roebuck & Co., 417 F.3d 789, 797 (7th Cir.2005). Whether an individual is a "qualified individual with a disability" is a two-part inquiry. Basith v. Cook County, 241 F.3d 919, 927 (7th Cir.2001). "First, we consider whether the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, license, etc." Id. (internal quotations and citations omitted). Second, if the individual does satisfy the position's prerequisites, we "consider whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation." Id. (internal quotations and citations omitted). Basden clearly satisfied the first question- she was hired into the position in mid 2007 and was able to perform her work through January 2008 without any major issues. She was clearly capable of doing both closing or dispatching duties or she would have been suspended or terminated for her inability to do work even before her MS symptoms began appearing. Second, Basden was capable of performing her job at PTI on a part time basis (the basis on which she worked prior to her termination) after receiving medical treatment from her specialist for her condition. Basden was not constantly absent from work from January 2008 until May 2008, her absences were sporadic and were not extended. (Kirk Dep. pp. 50-55; Exhibit K). All that PTI would have had to have done to retain Basden, a good employee, was to allow her to be off work for 30 days, without pay, so that she could begin treatment. Basden currently works a part time job as a receptionist at Tri-State Food Bank. (Basden Dep. II pp. 5-6). Now that Basden utilizes Rebif injections, Basden could perform the duties of her position at PTI, and PTI, who has the burden on this motion, has no evidence that she should not do so. Because there is a question of fact on this issue, it must be left to the jury.

### 3.  PTI Failed to Engaged in the Interactive Process

Once an employer knows of an employee's disability and the employee has requested reasonable accommodations, the ADA and its implementing regulations require that the parties engage in an interactive process to determine what precise accommodations are necessary.  Liability for failure to provide reasonable accommodations ensues where the employer bears responsibility for the breakdown.  Both sides must participate in the interactive process necessary to determine what accommodation is reasonable. *See,* Beck v. University of Wisconsin Board of Regents, 75 F.3d 1130,  1135 (7th Cir. 1996).  If a breakdown in the process occurs, the court must "attempt to isolate the cause of the breakdown and then assign responsibility." Id. Relevant factors include whether both parties participated in good faith in the process. Id. A party who "fails to communicate, by way of initiation or response" may be acting in bad faith. Id.

Here Basden has sufficient evidence to enable a jury to render a verdict in her favor.  Basden initiated the interactive process by giving PTI her doctor's information.  She asked for a change to her work duties, which was honored at first but then reversed.  In March 2008 Basden requested to be transferred to an open part time position, but her request was refused without explanation.  It was only in May of 2008, when Basden's doctor faxed a note directly to Kirk that Basden was moved to part time.  Realizing that she was not going to be able to perform her job properly until after she received treatment (an appointment for which was already scheduled within the 30 day leave period she requested), she spoke to Greulich and asked if there was anything that could be done. Instead of even considering a short, temporary leave, Greulich's response was basically to tell Basden to quit on good terms.

PTI was aware that Basden was ultimately seeking a short term leave so that she could receive treatment and return to work.  This was a request for accommodation pursuant to the ADA.  The interactive process requires the employer "to meet the employee half-way, and if it appears that the

employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help." Bultemeyer v. Fort Wayne Community Schools, 100 F.3d 1281, 1285 (7th Cir.1996). In other words, the ADA does not allow an employer who knows that an employee seeks an accommodation to avoid liability by claiming that the employee did not sufficiently clamor for a meeting to discuss potential accommodations. See Id. ("properly participating in the interactive process means that an employer cannot expect an employee to read its mind and know that he or she must specifically say 'I want a reasonable accommodation" ' to initiate the process); Erjavac v. Holy Family Health Plus, 13 F.Supp.2d 737, 749 (N.D.Ill.1998) (diabetic employee who requested greater access to the restroom sufficiently initiated the interactive process). Here, Basden notified her supervisors of her medical condition, provided written verification, and requested accommodation in three ways- to be moved to dispatching rather than closing duties (granted but then reversed), to be placed into an open part time position (refused on her first request but granted on her second request), and lastly, to be given a short unpaid leave to begin treatment. PTI cannot claim that Basden failed to request accommodation.

The facts regarding PTI's reaction to Basden's request for a reasonable accommodation and the parties' interactions thereafter preclude summary judgment. As noted above, the ADA states that reasonable accommodations include: "job restructuring, part-time or modified work schedules, [and] reassignment to a vacant position." 42 U.S.C. § 12111(9)(B). Basden contends PTI's actions with respect to her request for 30 days unpaid personal violate the ADA. The Seventh Circuit has recognized that, while "generally attendance is a requirement of a job," a failure to accommodate a reasonable request for medical leave may violate the ADA. Waggoner v. Olin Corp., --- F.3d ---, No. 98-2877, 1999 WL 98568 (7th Cir. Feb. 26, 1999); Haschmann v. Time Warner Entertainment Co., 151 F.3d 591 (7th Cir.1998). Thus, it has held that, even if an employee cannot show up for work, it is not necessarily true that he or she cannot perform the duties of a particular job. Waggoner v. Olin Corp., 1999 WL 98568 at *2. As to

absenteeism caused by a disability "(c)onsideration of the degree of excessiveness is a factual issue well suited to a jury determination." Id.

While PTI was not required to indefinitely provide a job, but not require that Basden regularly perform it, it was required to engage in an interactive process to determine whether Basden should be given medical leave and, if so, the conditions and length of the leave.  Instead, Basden's inquiries about and form written request for leave do to her MS were met with the simple proclamation that she did not qualify because she had worked there for 11 months rather than 12 months.  The ADA's accommodations requirements are not limited to those provided by the FMLA and/or written personal leave policies.  PTI had an obligation under the ADA to interact with Basden as to her leave request, not simply deny it.  Accommodation means that sometimes written personnel policies need to be slightly modified so that disabled persons may continue to work. Because a reasonable jury could find that PTI did not participate in interactive process in good faith when it summarily denied Basden's 30 day leave request PTI's motion for summary judgment as to Basden's accommodation claim should be denied.

    4.  Termination/Retaliation Claim under the ADA

Material factual disputes clearly preclude summary judgment on Basden's claims that she was terminated in violation of the ADA and/or retaliated against by PTI.  The ADA prohibits employers from discriminating against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, ... and other terms, conditions, and privileges of employment," 42 U.S.C. § 12112(a).

There is no doubt, even though Acuff and Kirk would like to distance themselves from having knowledge of the exact nature of Basden's condition, that they were aware that Basden was undergoing tests and Basden has testified that she told them that she most likely had MS per her neurologist. Greulich admits that Basden told him it was believed she had MS prior to her termination. Basden was

terminated by PTI immediately after she filled out a form requesting a short leave of absence clearly indicating it was for her MS.  PTI does not have a straight answer for why Basden was terminated- Acuff claims it was because she did not call in on May 26 (the day he received her request for leave) and was a "no-show" however Basden's attendance record does not reflect a "no-show" notation for that day.  Kirk claims that Basden was terminated because she hit her 8th incident of absenteeism, however Kirk ignored that Basden could not work due to illness from May 22-26, which would have been 5 days of absence that would have been part of her 7th incident for which she was due a suspension, not termination.

Despite testimony that PTI always follows its disciplinary policy with regards to attendance and treats it as mandatory rather than discretionary, there are 23 dispatchers, none of whom were perceived to be disabled by PTI, that were allowed leniency as the policy was applied to them.  They received multiple written warnings, verbal warnings and suspensions before termination, if they were even terminated.  PTI has treated Basden differently than the employees not perceived as disabled, creating an issue of material fact as to why Basden was subjected to a mandatory verbal, written, suspension, termination sequence when employees not subject to the ADA were not.

**B.  Family and Medical Leave Act Claim**

The FMLA entitles any eligible employee suffering from a serious health condition that renders him unable to perform the functions of his position to twelve workweeks of leave during each twelve-month period. 29 U.S.C. § 2612(a)(D). The FMLA makes it unlawful for an employer to interfere with an employee's attempt to exercise any FMLA rights. *Id.* § 2615(a)(1).  Here, Basden does not deny that at the time she applied for leave, she was a little over a month short of her one year anniversary of employment with PTI.  However, had PTI complied with the ADA, Basden would have had 30 days leave to receive treatment and return to work (on June 23, 2008).  She would have only have had to work less than a week, until June 29, 2009 until she was entitled to FMLA leave.  A jury could find in this case

15

that PTI interfered with Basden's FMLA rights by preventing her from reaching her one year anniversary with PTI and entitlement to leave under the FMLA, if Basden ever even needed it. PTI avoided having to potentially provide FMLA leave by denying her request for personal leave, and therefore it could be found that it violated the FMLA as well as the ADA.

## IV.  CONCLUSION

For the foregoing reasons, PTI's motion for summary judgment should be denied.

>
> */s/ Stacy K. Newton*
> Stacy K. Newton,
> Indiana Attorney Number:  19438-49
> RUDOLPH, FINE, PORTER & JOHNSON, LLP
> 221 NW Fifth Street
> P. O. Box 1507
> Evansville, Indiana  47706-1507
> E-mail: skn@rfpj.com
> Telephone:     812.422.9444
> Facsimile:     812.421.7459
> Attorneys for Plaintiff, Terri Basden

## CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2011, a copy of the forgoing Response was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's CM/ECF system:

Paul J. Wallace
JONES • WALLACE, LLC
pwallace@joneswallace.com

Robert W. Rock
JONES • WALLACE, LLC
rrock@joneswallace.com

>
> */s/ Stacy K. Newton*
> Stacy K. Newton